## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

ROBERT REES-EVANS, BRIAND PARENTEAU,
JEROME RAPHAEL SIV, individually
and on behalf of all others similarly situated,
     Plaintiffs,

v.

AMP GLOBAL CLEARING, LLC,
AMP CLEARING, AMP FUTURES,
AMP GLOBAL US, AMP GLOBAL USA,
DANIEL LEE CULP

   Defendants.

**CLASS ACTION**
**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs, ROBERT REES-EVANS, BRIAND PARENTEAU and JEROME RAPHAEL, SIV file this class action complaint individually and on behalf of all others similarly situated against Defendants, AMP GLOBAL CLEARING, LLC and AMP FUTURES ("AMP") dba AMP CLEARING, AMP GLOBAL, AMP GLOBAL CLEARING, AMP GLOBAL US, AMP GLOBAL USA and AMP TRADING (hereinafter referred to as "AMP") and DANIEL LEE CULP, demanding a trial by jury. Plaintiffs make the following allegations based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge. Accordingly, Plaintiffs allege as follows:

## INTRODUCTION

1.   Plaintiffs assert this action pursuant to Section 6b(e)3 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 9, *et seq.*, and 17 C.F.R. Sec. 180.1 of the

regulations promulgated pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), on behalf of themselves and all similarly-situated customers of AMP GLOBAL CLEARING, LLC and AMP FUTURES (AMP) dba AMP CLEARING, AMP GLOBAL, AMP GLOBAL CLEARING, AMP GLOBAL US, AMP GLOBAL USA and AMP TRADING.

2.      AMP engaged in acts, practices, and a course of business that operated recklessly as a fraud or deceit upon Plaintiffs and the class.  As described in detail below, AMP mishandled Plaintiff's and class members futures and options investments on April 20, 2020, in that AMP:   i) failed to provide material information to Plaintiffs regarding the possibility of the price of their NYMEX Light Sweet May 20 Crude Oil Futures contracts (May 20 Crude Oil) and associated contracts going to a price below zero; ii) failed to provide Plaintiffs a way to exit, buy, trade, roll, modify or offset their long positions in May 20 Crude Oil and associated contracts;  iii) failed to liquidate Plaintiffs' and class members' futures and options on futures investments in a reasonable manner on April 20, 2020 when May 20 Crude Oil fell to a price of zero and proceeded to trade into negative prices; iv) took no steps to provide correct price data; and, v) did not insure that their trading platforms would be ready for negative oil prices, as a result of which it left several of its customers trapped in market positions,

while receiving inaccurate information about their positions, the account balances and price.

3.  AMP knew about the potential for the markets' volatile condition – including the possibility that the price of the May 20 Crude oil contract could trade into the negative, and that the crude oil contract becomes more volatile during the delivery period

4.  AMP was warned on April 3, April 8, April 15th and April 20th about the possibility of negative oil prices. The Chicago Mercantile Exchange ("CME") notified all FCMs that they had prepared an environment in which platforms could be tested to see how well they functioned with negative prices.

5.  Plaintiffs subscribed to all news alerts from AMP entitled, "Important Notices" and "Emergency Broadcasts." Yet at no time prior to April 20, 2020 or on April 20, 2020 did AMP convey information from the CME contained in its three advisories to FCM back-offices. Just as importantly, at no point were they warned that AMP would be taking no steps to prepare and would be exposing their customers to unlimited risk.

6.  Yet AMP took no steps to increase its margin requirements, warn its customers about information it had received, or protect its customer segregated accounts-exposing its customers to unlimited risk and endangered its customer segregated accounts.

7. In offering trading services, AMP assumed a duty to ensure that its systems and customer services were sufficiently equipped to reliably deliver services under foreseeable customer demands and market conditions as what occurred on April 20, 2020.

8. Plaintiffs and members of the proposed class understood and had the reasonable belief that AMP would be prepared for a market event it was warned of. Yet despite having knowledge of the possibility of crude oil futures trading negatively for weeks, AMP failed to disclose this possibility to its trading customers, correct its own deficiencies on its online trading platform and customer service, and chose to ignore the warning of the relevant exchanges.

9. AMP did not i) take action to alert its customers to the possibility that the price of May 20 Crude Oil Contract could go to zero and below; ii) prepare its trading systems to be able to accept trades if the price of the May 20 Crude Oil contract declined to zero and into negative prices or, alternatively provide a way for the customers to place orders manually or through a separate vehicle, since its automated trading systems could not accept negatively priced Crude Oil orders; iii) take action to promptly liquidate positions in the May 20 Crude Oil contracts in accounts which became under-margined when the May 20 Crude Oil contract declined to zero and into negative prices, causing clients' accounts to lose thousands of dollars and in some instances incur debit balances; and iv) did not

4

adjust their margin requirements to reflect a market possibility they were uniquely warned about.

10. AMPs' failure to provide its clients with material information, and to provide a means for customers to get accurate information about their accounts and not be trapped in positions without any way of getting out also violated the implied covenant of good faith and fair dealing contained in its Futures Client Agreement and acted with negligence and gross negligence.

11. AMP's reckless actions make them liable for hundreds of thousands of dollars in damages incurred by Plaintiffs and the class.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. § 1331. the CEA, 7 U.S.C. Sec. 25(c). The Court also has subject matter jurisdiction under 28 U.S.C. Sec. 1332(d) because (i) the matter in controversy exceeds $75,000, exclusive of interest and costs; and ii) there are members of the proposed class who are citizens of a different state than Defendants.

13. This Court has personal jurisdiction of the Defendants because they operate and carries out a business in Chicago Illinois.

14. Venue is proper in this District pursuant to & U.S.C. Sec. 25(c) because the Defendants are found and transact business in this District. Venue is proper in this Court pursuant to 28 U.S.C. Sec. 1391(b)(1) because AMP is

subject to personal jurisdiction in the state of Illinois with respect to this civil action, and in this district.

## PARTIES

15. Plaintiff Robert Rees-Evans is an individual and resident of Ontario, Canada. He was a client of AMP at all times relevant throughout the class period.

16. Plaintiff Briand Parenteau is an individual and resident of the state of California. He was a client of AMP at all relevant times throughout the class period.

17. Plaintiff Jerome Raphael SIV is an individual and resident of France. He was a client of AMP at all relevant times throughout the class period.

18. Daniel Lee Culp is the President of AMP Global Clearing LLC and AMP Futures.

19. AMP Global Clearing LLC and AMP Futures do business as AMP Clearing, AMP Global, AMP Global Clearing, AMP Global US, AMP Global USA and AMP Trading. AMP acts as a commodities broker and is registered as a futures commission merchant (FCM) with the Commodity Futures Trading Commission (CFTC) and is a member of the National Futures Association (NFA). AMP conducts futures business and is engaged in providing futures execution services to its clients. At all times AMP conducted business in this District where it provided services to Plaintiffs.

## FACTUAL BACKGROUND

### A. Relevant Statutes and Rule

20.     7 U.S.C. **§** 6b(e)3 makes it unlawful to engage in an act that operates as a
fraud or deceit in connection with the making of an options contract:

> *It shall be unlawful for any person, directly or indirectly,…in or
> in connection with any order to make, or the making of, any
> contract of sale of any commodity for future delivery (or option on
> such a contract), …to engage in any act, practice, or course of
> business which operates or would operate as a fraud or deceit upon
> any person.*

21.     7 U.S.C. § 9, *et seq*, establishes that it is illegal to employ or engage in
any swap, or contract of sale, of any commodity in interstate commerce, to
provide false information  regarding the same, or to engage in false or
fraudulent reporting, of the same. It also gives the administrative
agencies the power to create specific regulations for enforcement. 17
C.F.R. § 180.1 was promulgated under this statute.

22.     17 C.F.R.§§ 1.11, a rule promulgated by the CFTC requires FCMs to have
risk management systems in place to protect customer funds and have
provisions in place for risk tolerance limits and liquidity risks.

23.     17 C.F.R. §180.1,a rule promulgated by the CFTC under  Dodd-Frank
states:

> *(a) It shall be unlawful for any **person**, directly or indirectly, in
> connection with any **swap**, or **contract of sale** of
> any **commodity** in interstate commerce, or contract for future*

> *delivery on or subject to the rules of any **registered entity**, to intentionally or recklessly: . . .*
>
> *(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to **state** a material fact necessary in **order** to make the statements made not untrue or misleading;*
>
> *(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any **person**; or,*
>
> *(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any **commodity** in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate. Notwithstanding the foregoing, no violation of this subsection shall exist where the **person** mistakenly transmits, in good faith, false or misleading or inaccurate information to a price reporting service.*

24.     Section 25 of the CEA creates a private right of action for violations of

Sections 6b(e).  Section 25(a)(1)(B) states that:

> *[a]ny person…who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages…caused by such violation to any person-…who made through such person any contract of sale of any commodity…; or who deposited with or paid to such person money…in connection with any order to make such contract….*

25.     Section 25 also creates a private right of action for violations of Rule

180.1.  Section 25(a)(1)(D) states that:

> *[a]ny person…who violates this chapter or who willfully aids,
> abets, counsels, induces, or procures the commission of a violation
> of this chapter shall be liable for actual damages…caused by such
> violation to any other person- …who purchased or sold a contract
> [of sale of any commodity for future delivery (or option on such
> contract or any commodity)] if the violation constitutes - …the use
> or employment of, or an attempt to use or employ, in connection
> with …a contract of sale of a commodity, in interstate commerce,
> or for future delivery on or subject to the rules of any registered
> entity, manipulate device or contrivance in contravention of such
> rules and regulations [promulgated pursuant to Dodd-Frank]…*

## B.     Plaintiffs Purchase Futures and Options on Futures on the May 20 NYMEX Light Sweet Crude Oil Contract and QM contract

26.     Plaintiffs are individual investors with brokerage accounts at AMP.  The

Plaintiffs' investments at issue here, are futures and options on futures

contracts in the May NYMEX Light Sweet May 2020 Crude Oil contract

(herein referred to the "May 20 Crude Oil contract") and *E-Mini* Light

Sweet Crude Oil futures ("QM").

27.     A futures contract is a legally binding agreement to buy or sell a

standardized asset on a specific date or during a specific month. "Trading

in futures contracts is facilitated through a futures exchange.

28.     The fact that futures contracts are standardized and exchange-traded

makes these instruments indispensable to commodity producers,

consumers, traders, and investors.

9

29. An option on a futures contract gives the option holder the right, but not the obligation, to buy or sell a specific futures contract at some point in the future at a specified price.

**C.    May 2020 NYMEX Light Sweet Crude Oil Contract**

30. On April 20, 2020, Plaintiffs' accounts contained substantial long positions in QM contracts.

31. The NYMEX Light Sweet Crude Oil futures contract is traded on the Chicago Mercantile Exchange ("CME") under trading symbol CL, minimum tick size: $0.01 per barrel, worth $10.00 per contract. This contract is deliverable meaning that at the expiration of the contract month crude oil is physically delivered to the buyer of the contract.

32. Plaintiffs accounts also held substantial long positions in *E-Mini* Light Sweet Crude Oil futures (QM) and options on these contracts through AMP.  The E-Mini Light Sweet Crude Oil futures contracts are tied to the NYMEX Light Sweet Crude Oil futures contract, but are smaller, in that, the E-mini Light Sweet Crude Oil futures contracts are traded in 0.025 increments and the full-sized Light Sweet Crude Oil futures are traded in 0.01 increments. The trading symbol for the contract is QM, and it is traded on the CME. The E-mini contract is financially settled upon expiration of the contract – i.e. there is no physical delivery of crude oil for purchasers of the contract. The settlements in the E-mini Crude Oil (QM)

futures contracts are derived directly from the settlements of the regular sized Crude Oil (CL) futures contracts, rounded to the nearest tradable tick.

33. NYMEX Sweet Light Crude Oil futures and options, as well as the smaller -mini contracts, trade actively on the Chicago Mercantile Exchange and their prices change throughout the trading session in response to economic events and market activity.

34. On April 3rd 2020, the CME notified CME Globex and Market Data Customers of "Changes to Price and Strike Price Eligibility Flags for Certain Energy Options Contracts."

https://www.cmegroup.com/notices/electronic-trading/2020/04/20200403.html

35. On April 8, 2020, the Chicago Mercantile Exchange (CME) the commodity exchange on which Crude Oil and E-mini Crude Oil futures and options are traded and cleared, sent out a regulatory advisory, entitled, "CME Clearing Plan to Address the Potential of a Negative Underlying in Certain Energy Options Contracts." The purpose of which was "to let the market know that CME Clearing is ready to handle the situation of negative underlying prices in major energy contracts and [we want] to give all of our clearing firms, customers, and partners a view into what the CME Clearing plan is so that each of our partners can do their own respective planning for this potential situation." The "underlying"

referred to in the subject of the advisory are the underlying futures

contract or WTI Crude Oil futures, RBOB Gasoline futures and Heating

Oil futures.   This April 8, 2020 CME advisory announced that it had been

testing plans to support the possibility of a negative options  if in any

month WTI oil futures settled between $8.11 and $11 a barrel, but that it

could switch to a different pricing model that would allow for a negative

price in WTI oil futures.

https://www.cmegroup.com/content/dam/cmegroup/notices/clearing/2020/0
4/Chadv20-152.pdf

36.     On April 15, 2020, the CME sent out another advisory to clearing firms,

CFO, back-offices, and futures commission merchants that they had

provided an environment where firms could test negative prices, "

Effective immediately, firms wishing to test such negative futures and/or

strike prices in the systems many utilize CME's 'New Release' testing

environments, for products CL (crude oil futures) and LO (options on

those futures.)'"  Undoubtedly the Defendants also received this notice.

https://www.cmegroup.com/content/dam/cmegroup/notices/clearing/2020/0
4/Chadv20-160.pdf

37.     On the morning of  April 20, 2020, at approximately 10:50 CST, the CME

issued a third warning that oil prices could go negative, leaving AMP most

of the trading day (WTI futures remained positive until approximately

1:08 pm CST) to liquidate positions, increase variation or maintenance

margin or communicate this to all its customers. It did nothing.

https://www.reuters.com/article/global-oil-contracts-cme-grp/cme-group-as-oil-contract-plunges-negative-saysmarkets-

working-fine-idUSL1N2C82MD

38. On April 20, 2020, the May E-mini crude oil futures contract gradually declined throughout the day and then dropped from $0 to -$37.62 during the last 15 minutes of trading before settlement and expiration. (Exhibit C)

39. Nowhere in any risk disclosure agreement, nor any agreement, provided by AMP to its customers or traders does AMP warn that negative prices can occur.

40. At no time subsequent to April 3, 2020 and before occurrence of negative oil prices on April 20, 2020, did AMP institute substantially greater margin requirements for all its traders and clients knowing, as it knew, that negative prices, and hence potentially infinite risk, was a real possibility. Its negligence in not doing so put all other clients and the firm at risk, not just the Plaintiffs.

41. At no time subsequent to April 3, 2020 and before occurrence of negative oil prices on April 20, 2020, did AMP decide to mitigate losses by stopping trading at zero, forcing liquidations at zero, or setting trading to liquidate only mode to prevent new long positions from being opened and/or to liquidate below $10, as was implemented post April 20, 2020.

https://news.ampfutures.com/temporary-margins-increase-energies-complex-april-2020

42.  Despite possessing knowledge of the possibility of oil futures markets trading negatively for weeks prior to April 20, 2020, AMP failed to test its online platforms, ready its system to correct deficiencies, and failed to disclose to its customers that it would ignore the multiple warnings issued by the CME and NYMEX.

43.  On April 20, 2020 despite crude oil contracts trading below zero, AMP's trading platforms continued to show incorrect prices and account values. The platforms appeared to be functioning normally.

44.  However, several traders were trapped in their positions and had them settled in cash at the settlement price for the May crude oil contract of -$37.63.  Plaintiffs attempted to exit their positions multiple times. Plaintiff Raphael SIV attempted to exit his position over seven times.

45.  On April 21, 2020, CFTC Chair Heath Tarbert reiterated on CNBC that exchanges and market participants like FCMs were preparing for well ahead of time for the occurrence of negative oil prices, " Market participants as well as the CFTC have actually been preparing for some time to make sure that our trading systems can handle negative prices."

https://www.cnbc.com/video/2020/04/21/commodity-futures-trading-commission-chair-heath-tarbert-on-oilfutures-plummet.html

46.  On April 21, 2020, AMP sends an email to the Plaintiffs stating that the oil markets "went Negative Price in a big way."  The email also stated that the

volatility was known and blamed the Corona virus. AMP did not admit the failure of its risk control, operational and trading systems.

47. In subsequent communications with the Plaintiffs, AMP's president, Daniel Culp blamed the CME for failing to provide a "fair, structured market." Still taking no responsibility for leaving traders stranded in positions and having to fly blind by being provided false information about market price and their account balances.

48. On April 22, 2020, CME Group's Chairman, Terrance Duffy appeared on CNBC lauded how well the exchange handled orders and how it was the responsibility of the FCM to communicate with their retail customers,

> *"We worked with government regulators two weeks prior to making our announcement that we were going to allow negative price trading…The small retail investors are somebody that we do not target. We go for professional participants in our marketplace. But at the same time, they need to make sure they understand the rules and its up to the futures commodity merchants to make sure every participant knows those rules."*

> https://www.cnbc.com/video/2020/04/22/cme-group-ceo-responds-to-requests-for-investigation.html

49. Futures are touted as an investment suitable for the individual retail investors at AMP in their individual and IRA accounts which advertises

itself as a "trading supercenter" with "Micro Futures" accounts and $100 account minimums.

50. In offering trading services, AMP assumed a duty of care to ensure that its trading and customer support systems were sufficiently equipped to reliably deliver trading services under the foreseeable customer demands and market conditions that occurred on April 20, 2020. Plaintiffs and class members understood and reasonably assumed that AMP would honor its representations and covenants with its customers and be prepared and that the representations on AMP's website are not mere puffery.

51. AMP failed to live up to its risk disclosure document or abide by any risk management program in contravention to CFTC 17 C.F.R.§§ 1.11. Nor is this the first time AMP has failed to apply adequate risk protocols. Exhibit A

52. On April 20, 2020, Plaintiffs were not able to place orders below zero in the May 20 Crude Oil products and therefore were not able to modify, offset or exit their positions.

53. AMP chose to be deliberately unprepared for the market events of 4/20/20 and did not even provide a valid quote below zero on its platform. In fact, even for days after, the platforms of AMP showed incorrect prices and values.

54. Plaintiff Raphael SIV's orders to liquidate a long position were rejected as the software did not recognize a negative price, leaving him trapped in a position.

55. Additionally, Plaintiffs' accounts were not closed out promptly when the price fell below zero and the accounts did not contain enough cash to maintain the positions. Instead, the long Crude Oil positions were permitted to remain in the account long after the account was under-margined resulting in substantial losses to Plaintiffs' accounts. All while displaying false account values and false prices.

56. While Plaintiffs" account values were in debit territory, they were still able to send orders to open new positions in other instruments. This demonstrates that the risk management systems of the AMP were either non-existent or not operational.

57. Generally, in the futures market, to mitigate risk, a certain amount of money must always be maintained on deposit when trading with a futures broker this is called margin. When a trader first enters a futures position, the trader must post the initial margin requirement. Once the position is established, the trader is held to a maintenance margin requirement, which is less than the amount of the initial margin requirement. If the equity in a customer's account drops below the maintenance margin requirement due to adverse price movement, the broker will issue a

"margin call" to restore the customer's equity to the initial margin requirement.

58. The CFTC defines a margin call as a request from a brokerage firm to a customer to bring margin deposits up to initial levels. If an account goes below the amount required to be posted as maintenance margin, then a margin call is made, and the account must be replenished to bring the amount back up to the initial margin requirement, or an amount that may be required by the futures commission merchant during the trading day in order to maintain the trading position. If a margin call is not met within a short time frame, often within a business day, the position may be liquidated or closed.

59. According to the terms of AMP's own risk disclosure statement, it is stated that AMP will liquidate positions if they exceed the margins required. However, AMP failed to abide by its policy on 4/20/20 with regards to oil. As a result of this failure, Plaintiff's account as well as accounts of other individual retail investor accounts ended with large negative balances which could have been avoided had AMP acted in good faith and closed out the positions on 4/20/20 when the accounts became under-margined or even when customer equity fell below zero.

60. The "Disclosures" incorporated into the Futures Client Agreement informed Plaintiffs that:

> *If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position,* ***If you do not provide the required funds within the time required by your broker, your position may be liquidated at a loss,*** *and you will be liable for any resulting deficit in your account.* (Emphasis added).

61. At no time were the Plaintiffs given a margin call. Nor were they provided the opportunity to offset their positions.

62. AMP did nothing when the price of May 20 Crude Oil went below zero and proceeded into negative pricing, knowing that Plaintiffs would not be able to place an order to exit the position and exposing them to unlimited risk.

63. The possibility of the contract going below zero should have been anticipated by AMP [as an futures commission merchant responsible for the execution of Plaintiff's trades on CME] and AMP should have alerted its clients particularly prior to the date of delivery, April 20th. To the extent that AMP concluded that Plaintiffs' positions became under-margined, AMP should have closed Plaintiffs' positions promptly.

64. Instead of taking either of the commercially reasonable alternatives outlined above, AMP acted recklessly. It failed to take action to permit its clients the ability to place orders in the May 20 Crude Oil contract when

the price touched zero and declined into negative pricing, and further, failed to increase margin before this event, and failed to liquidate Plaintiffs' accounts promptly when the accounts became under-margined, but waited to do so long after the account became under-margined and sustained extreme losses leaving the account with a debit balance.

65. The failure of AMP to act to mitigate investor losses by offsetting their positions promptly or within a reasonable time of the accounts becoming under-margined, or to contact clients to notify them of the fact that crude oil was below zero or provide them with an option to exit, modify, offset roll the position by placing an order via another means other than an automated order platforms (which was not able to recognize negative pricing), caused severe losses to Plaintiffs and the class members who had long futures positions in the May Crude Oil contract.

66. Instead of admitting to its failures, AMP has sent repeated letters demanding payment for accounts that have negative balances solely because of the occurrence of negative oil prices and traders being unable to modify their positions. President Dan Culp's multiple threats of formal collection caused deep mental stress for the Plaintiffs in part due to the disproportionate amount of their debit in comparison to their initial balances.

67. AMP knew or should have known about the possibility of crude oil incurring negative pricing as it executed trades in these markets for

clients cleared through CME; which had notified firms that the crude oil price had the potential to go below zero and to prepare for this possibility.

68.     AMP knew it had no basis to expect its platforms to function in a negative price environment but failed to convey this fact to any of its customers.

69.     AMP failed to notify/advise their customers of material information regarding the crude oil markets, although it was clear based upon the CME's advisory that the contract had the potential to go below zero and to prepare for such an event. The omission of a material fact prevented Plaintiffs from making an informed decision regarding the management of their positions in the Crude Oil contracts as they were not aware of the potential for loss in this market.

70.     AMP has offered to bring some customers' negative account balances to zero but has not made this offer to all its customers.

71.     AMP was not the only brokerage firm for whom the negative oil prices exposed inadequacies in its software. Other brokerage firms like E*TRADE and Interactive Brokers also had issues with their software. But other brokerages have owned up to their failures and made their customers whole.

72.     Interactive Brokers, which admitted to having a software deficiency during this time, made all their customers whole admitting to a "$113 million mistake." Thomas Peterffy, the chairman and founder of Interactive Brokers stated that they would, "rebate from our own funds to

our customers who were locked in with a long position during the time the price was negative any losses they suffered below zero."[1]

73. AMP has treated its customers differently. AMP has chosen to credit some of the losses back to some customer accounts but not to all its customers' accounts. This goes against the rules for impartial and fair treatment of customers

74. Any recovery of AMP on any debit purportedly owed by a Plaintiff is barred by AMP's violations of 17 C.F.R. Sec. 180.1 and 17 C.F.R.§§ 1.11, as well as their breach of the covenant of good faith and fair dealing.

75. On September 9, 2020, after an audit, Taiwan's FSC (Financial Supervisory Commission) announced that it was imposing sanctions on 12 futures brokers for violating futures management laws and regulations as a result of not having being prepared for the market events of April 20, 2020 and lacking internal controls. The FSC ordered all 12 brokers to issue customer refunds and fined them $754,000.[2]

## CLASS ACTION ALLEGATIONS

76. Plaintiffs seek certification of a class of participants (the "Class") as follows:

All persons, corporations, and other legal entities that held long futures positions (or short put positions) with AMP on April 20, 2020, who were

---

[1] https://www.bloomberg.com/news/articles/2020-05-08/oil-crash-busted-a-broker-s-computers-and-inflicted-huge-losses
[2] https://www.fsc.gov.tw/ch/home.jsp?id=2&parentpath=0&mcustomize=

damaged by AMP's failure to inform them of the possibility of the May 2020 Crude Oil futures contract going to zero or the forced sale or liquidation of their May 2020 Crude Oil futures or options positions on April 20, 2020; or who were unable to place orders to offset, modify or exit their May 20 Crude Oil futures or options position on April 20, 2020.

77. Excluded from the Class are Defendants, and their directors, officers, or employees.

78. This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets the requirements of Rule 23(a)(1-4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

79. Numerosity. The Class is so numerous that individual joinder of all members is impracticable.

80. Commonality. There are numerous questions of fact or law that are common to Plaintiffs and all the members of the Class. Common issues of fact and law predominate over any issues unique to individual Class members. Issues that are common to all class members include but are not limited to the following:

   a. Whether Plaintiffs and class members held long futures positions or short put option positions in May 20 Crude Oil contracts in accounts at AMP on April 20, 2020;

b. Whether Plaintiffs were unable to (due to the inability of AMP's automated trading systems to accept an order) exit, modify or offset their long futures positions or short options positions in the May crude oil contracts for their accounts when the contracts hit the price of zero on April 20, 2020;

c. Whether Plaintiffs were informed by AMP of the possibility of the May 20 Crude Oil contract declining to a price of below zero before April 20, 2020.

d. Whether Defendants were in breach of its contracts or the implied covenant of good faith and fair dealing in connection with its fairly to provide adequate technology and customer service support in a timely manner;

e. Whether Plaintiffs and other class members are entitled to injunctive and declaratory relief; and Whether Plaintiffs and class members were damaged by the liquidation.

81. <u>Typicality</u>. Plaintiffs have claims that are typical of the claims of all the members of the Class. Plaintiffs' claims and all of the class members' claims arise out of the same uniform acts and course of business employed by AMP on April 20, 2020 and arise under legal theories that apply to the claims of Plaintiffs and all other members of the Class.

82. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs do not have

claims that are unique to Plaintiffs, nor are there defenses unique to Plaintiffs that could undermine the efficient resolution of the Class' claims. Further, Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them. There is no hostility between Plaintiffs and the unnamed class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

83. <u>Predominance</u>. Common questions of law and fact predominate over questions affecting only individual class members. The only individual issues likely to arise will be the exact amount of damages recovered by each class member, the calculation of which does not bar certification.

84. <u>Superiority</u>. A class action is superior to all other feasible alternatives for the resolution of this matter. Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.

85. <u>Manageability</u>. This case is well suited for treatments as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented on a class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

86. Defendants have acted similarly with respect to the entire Class by uniformly subjecting Plaintiffs and the Class to the course of business described above.

**COUNT 1**
**Violations of CEA, 7 U.S.C. § 9, and 17 C.F.R. Sec. 180.1**

87. Plaintiffs incorporate the allegations of paragraphs 1 through 86 as if fully set forth herein.

88. AMP failed to notify/advise their customers of material information regarding the crude oil markets, that it had the potential to go below zero, although it was clear based upon the CME's advisory that the contract had the potential to go below zero and to prepare for such an event. The omission of a material fact prevented Plaintiff from making an informed decision regarding the management of their positions in the Crude Oil contracts as they were not aware of the potential for loss in this market.

89. Furthermore the failure of AMP to act to mitigate investor losses by offsetting their positions promptly or within a reasonable time of the accounts becoming under-margined, or to contact clients to notify them of the fact that May Crude was at zero and providing them with an option to exit, modify, offset roll the position by placing an order via another means other than an automated order platforms (which were not able to recognize negative pricing), AMP caused severe losses to Plaintiffs and the class members who had long futures positions in the E Mini crude oil

contract. And for those accounts incurring debit balances AMP has sent letters demanding payment for such deficiencies.

90.    By doing so, Defendants violated 180.1 in that its conduct was reckless or intentional in violation of 17 C.F.R. §180.1(a)(3)

**COUNT II**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

91.    Plaintiffs incorporate the allegations of paragraphs 1 through 90 as if fully set forth herein.

92.    Plaintiffs and class members each signed a customer agreement, which contains a provision giving AMP discretion to liquidate Plaintiffs and class members May 20 Crude Oil long futures positions and short puts positions.

93.    Implicit in that provision is a covenant of good faith and fair dealing that AMP will exercise its discretion to liquidate in a good faith and in a commercially reasonable manner.

94.    AMP acted unreasonably when it failed to promptly or within a reasonable time, liquidate Plaintiffs' positions when the accounts became under-margined leading to excessive losses and in many cases deficit balances in the accounts on April 20, 2020.

95.    Furthermore AMP failed to provide Plaintiffs with the ability to place an order to exit, modify, offset roll the position by placing an order via another means other than an automated order platform (which was not able to recognize negative pricing), causing severe losses to Plaintiffs and the class members who had long futures positions in the May Crude Oil contract.

96.    By doing so, AMP breached the customer agreement's implied covenant of good faith and fair dealing.  Plaintiffs and class members have been damaged as a result.

## COUNT III
### Violation of CEA Section 6b(e)3

97.    Plaintiffs incorporate the allegations of paragraphs 1 through 96 as if fully set forth herein.

## COUNT IV
### Negligence

98.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 97 as if fully set forth herein.

99.    AMP had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

100.    AMP unlawfully breached its duties by, among other things, failing to provide adequate technological systems and customer support necessary to perform under the contract and denying Plaintiffs and class members from acting in a timely manner.

101.    AMP's negligence and breach of duties to the Plaintiffs and class members proximately caused losses and damages that would not have occurred but for AMP's breach of its duty of care.  These losses reflect damages to Plaintiffs and class members in an amount to be determined at trial or separate proceeding as necessary.

## COUNT V
## **Gross Negligence**

102.   Plaintiffs hereby incorporate the allegations of paragraphs 1 through 101 as if fully set forth herein.

103.   AMP had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

104.   AMP unlawfully breached its duties by among other things failing to provide adequate technological systems and customer support necessary and denying Plaintiffs and class members from acting in a timely manner, and exposing them to unlimited risk.

105.   AMP's planned negligence could not have been foreseen by the Plaintiffs. AMP was alerted of the possibility of negative oil prices by the CME, advised to prepare and to test its platforms and systems and to communicate to its customers-it chose to do nothing.  And made no effort to inform its customers of its planned negligence, acting precisely as if they had no risk control measure or concern for the customers risk exposure at all.

106.   AMP's conduct as alleged in this Complaint was and continues to be a departure from the ordinary standard of care.  On April 20, 2020, AMP constructively abandoned its customers by leaving them unable to place orders.  As a result, Plaintiffs and class members incurred substantial losses.

107.    AMP's gross negligence and breach of its duties owed to the Plaintiffs and class members proximately caused losses and damages that would not have occurred but for AMP's gross breach of its duty of care.

## COUNT VII
## Breach of Contract

108.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 107 as if fully set forth herein.

109.    AMP did not act in accordance with the customs and usages of the relevant exchange (CME), and blatantly breached its agreement with Plaintiffs by failing to ensure that transactions it executed in E Mini crude oil contracts traded on the exchange for its customers were subject to the rules, customs and usages as instructed by the CME in its advisories.

110.    The CME, in its custom and practice of providing information relating to the usage of the exchange for the trading of crude oil, advised and directed FCMs utilizing its markets, including AMP, of the possibility of the oil futures markets trading negatively and providing an environment where firms could test their software with negative prices.

111.    Despite being forewarned on multiple times for weeks prior to April 20, 2020, AMP failed to test its systems and correct for deficiencies.  They also failed to warn their customers that they would ignore the advisories of the CME and the NYMEX.

112.   AMP's breach of contract resulted in substantial damages and losses to the Plaintiffs and class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Robert Rees-Evans, Briand Parenteau and Jerome Raphael SIV, on behalf of themselves and all similarly situated customers of AMP, respectfully demand judgment against Defendants for:

(a)   Damages as set forth above, plus all other relief as the Court may deem appropriate;

(b)   That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

(c)   That the Court award Plaintiffs and the Class damages against Defendants for their violations of the Commodity Exchange Act;

(d)   That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

(e)   That Defendants be permanently enjoined and restrained from continuing to expose retail investors and traders to unlimited risk in their futures accounts;

(f)   That the Court declares that Defendants are not entitled to recover any purported deficiency amounts from Plaintiffs;

(g)     That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

(h)     Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: December 3, 2020
Chicago, Illinois

Respectfully submitted,

**/s/ R Tamara de Silva**

R Tamara de Silva (lead counsel)
Cheryl Fitzpatrick-Smith
De Silva Law Offices
980 N Michigan Avenue, Suite 1400
Chicago, IL 60611
Tel: (866) 566- 1849
Email: tamara@desilvalawoffices.com
Email: cheryl@futurescomplianceinc.com

Jonathan Lubin
8800 Bronx Ave., Suite 100H
Skokie, IL 60077
Tel: (773) 954-2608
Email: jonathan@lubinlegal.com

*Counsel for Plaintiffs*

**EXHIBIT A**

FILED

**NATIONAL FUTURES ASSOCIATION
BEFORE THE
BUSINESS CONDUCT COMMITTEE**

JUL − 2 2015

NATIONAL FUTURES ASSOCIATION
LEGAL DOCKETING

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| AMP GLOBAL CLEARING LLC | ) |
| (NFA ID #412490), | ) |
| | ) |
| and | )  NFA Case No. 15-BCC-024 |
| | ) |
| DANIEL LEE CULP | ) |
| (NFA ID #322596), | ) |
| | ) |
| Respondents. | ) |

## COMPLAINT

Having reviewed the investigative report submitted by the Compliance

Department of National Futures Association (NFA), and having reason to believe that NFA

Requirements are being, have been, or are about to be violated and that the matter should

be adjudicated, NFA's Business Conduct Committee issues this Complaint against Amp

Global Clearing LLC (Amp) and Daniel Lee Culp (Culp).

## ALLEGATIONS

## JURISDICTION

1. At all times relevant to this Complaint, Amp was an NFA Member futures

    commission merchant (FCM). As such, Amp was and is required to comply with

    NFA Requirements and is subject to disciplinary proceedings for violations thereof.

2. At all times relevant to this Complaint, Culp was the president, a principal and

    associated person of Amp and an NFA Associate. As such, Culp was and is

    required to comply with NFA Requirements and is subject to disciplinary

    proceedings for violations thereof.

## BACKGROUND

3.     In August 2014, NFA commenced an examination of Amp.  At the time of NFA's examination, Amp had over 13,000 active futures/options accounts.

4.     As alleged in detail below, NFA's exam found deficiencies in several facets of Amp's operations including its anti-money laundering (AML) procedures, its Risk Management Policy and the way the firm accrued for expenses.  These deficiencies appear to be the result of lax internal controls and oversight and Amp's and Culp's failure to diligently supervise the firm's operations to ensure that they complied with regulatory requirements.

## APPLICABLE RULES

5.     NFA Compliance Rule 2-9(a) provides that each Member shall diligently supervise its employees and agents in the conduct of their commodity futures activities for or on behalf of the Member.  Each Associate who has supervisory duties shall diligently exercise such duties in the conduct of that Associate's commodity futures activities on behalf of the Member.

## COUNT I

**VIOLATION OF NFA COMPLIANCE RULE 2-9: FAILURE TO DILIGENTLY SUPERVISE AMP'S OPERATIONS TO ENSURE THEY COMPLIED WITH REGULATORY REQUIREMENTS.**

6.     The allegations contained in paragraphs 1 through 5 are realleged as paragraph 6.

7.     Amp's AML Policy, dated August 2012, addressed accounts based in high-risk jurisdictions, as follows:

> The firm will especially scrutinize accounts that are located in problematic countries.  We will check the public statements of jurisdictions and accompanying narrative information of the Financial Action Task Force (FATF), FinCEN, and the "Major Money Laundering Countries" section of the "Money Laundering

and Financial Crimes" part of the U.S. Department of State's annual International Narcotics Control Strategy Report [INCS Report] to determine problematic countries and will factor this information into our decisions on whether to open or maintain accounts that are based in these jurisdictions. The firm will not open any accounts based in countries who appear on the above lists.

8. Amp's AML Policy is both unclear and contradictory on its face in that on the one hand it states that, if accounts are located in "problematic countries," it "will factor this information" into its decisions on whether to open such accounts. On the other hand, the AML Policy clearly states that Amp will not open accounts located in these same jurisdictions. It appears that Amp personnel could not follow such an unclear policy as they opened at least 55 accounts in problematic countries listed by FATF, FinCen, or in the INCS Report.

9. Not only was Amp's AML Policy confusing, but the firm's personnel were confused as to who was responsible for implementing the Policy. NFA spoke with the employee at Amp who identified himself as the responsible party for monitoring accounts for suspicious activity and he indicated that he had not performed any such monitoring for over a year. Later, the firm claimed that another individual was responsible for monitoring accounts. This apparent confusion as to who was responsible for monitoring accounts evidences the lack of adequate internal controls at the firm.

10. In addition, Amp also ignored certain terms of its AML Policy. For example, Amp's AML Policy stated that "All employees of the Firm are to receive a copy of the firm's AML Policy and are required to follow such policy and procedure." However, Amp was unable to show that it distributed its AML Policy to all employees.

3

11. Amp's 2014 Risk Management Policy was also deficient in a number of aspects. For example, it failed to adequately address the risk limits and underlying methodologies employed by the firm in regard to operational, foreign currency, legal, settlement, segregation, and technological risks. Further, it failed to discuss how exceptions to these risk limits would be addressed, the methods that would be used to detect breaches of the risk limits, and the procedures for alerting management of a breach. Amp's Risk Management Policy also did not discuss the procedures for distributing it to relevant supervisory personnel. (The firm also failed to maintain records of the persons to whom the Risk Management Policy was distributed.) Lastly, the Risk Management Policy did not provide for a review and approval of the risk tolerance limits quarterly by senior management and annually by the firm's governing body.

12. NFA informed Amp management of the above deficiencies during NFA's 2014 exam. The firm recently provided a revised and updated Risk Management Policy to NFA which failed to correct the vast majority of the deficiencies identified above, further demonstrating the firm's lack of effective supervision and oversight of its operations.

13. Amp's chief compliance officer (CCO) is responsible for developing and administering appropriate policies and procedures to ensure Amp's compliance with all applicable NFA and Commodity Futures Trading Commission (CFTC) rules and regulations. In June 2014, Amp hired an individual as its new CCO, at an annual salary of $33,000, who – prior to assuming the role of Amp's CCO – had no

compliance experience and previously worked as an administrative assistant at another FCM.

14.     During NFA's examination, the new CCO was unable to answer very basic questions or provide the exam team with requested documents.  Instead, Culp responded to most of NFA's inquiries and produced documents requested by NFA.

15.     NFA's exam also found that Amp failed to properly record and accrue for certain expenses from August 2014 through December 2014.  Although this had no material effect on the firm's adjusted net capital, it did cause the firm's external auditor to cite the firm for a material inadequacy in the firm's 2014 financial audit.

16.     NFA's exam further found that, when Amp issued margin calls, it notified a customer by e-mail of the margin call but did not disclose the exact amount of the margin call.

17.     The foregoing deficiencies evidence a failure on the part of Amp and Culp to supervise the firm's operations to ensure that its AML policies and procedures were adequate and that its books and records were accurate and complete.

18.     By reason of the foregoing acts and omissions, Amp and Culp are charged with violations of NFA Compliance Rule 2-9(a).

## PROCEDURAL REQUIREMENTS

### ANSWER

You must file a written Answer to the Complaint with NFA within 30 days of the date of the Complaint.  The Answer shall respond to each allegation in the Complaint by admitting, denying or averring that you lack sufficient knowledge or information to admit or deny the allegation.  An averment of insufficient knowledge or information may only be

made after a diligent effort has been made to ascertain the relevant facts and shall be deemed to be a denial of the pertinent allegation.

NFA staff is authorized to grant such reasonable extensions of time in which an Answer may be filed as it deems appropriate. The place for filing an Answer shall be:

> National Futures Association
> 300 South Riverside Plaza
> Suite 1800
> Chicago, Illinois 60606
> Attn: Legal Department-Docketing
>
> E-Mail: Docketing@nfa.futures.org
> Facsimile: 312-781-1672

Failure to file an Answer as provided above shall be deemed an admission of the facts and legal conclusions contained in the Complaint. Failure to respond to any allegation shall be deemed an admission of that allegation. Failure to file an Answer as provided above shall be deemed a waiver of hearing.

### POTENTIAL PENALTIES, DISQUALIFICATION AND INELIGIBILITY

At the conclusion of the proceedings conducted as a result of or in connection with the issuance of this Complaint, NFA may impose one or more of the following penalties:

(a) expulsion or suspension for a specified period from NFA membership;

(b) bar or suspension for a specified period from association with an NFA Member;

(c) censure or reprimand;

(d) a monetary fine not to exceed $250,000 for each violation found; and

(e) order to cease and desist or any other fitting penalty or remedial action not inconsistent with these penalties.

The allegations in this Complaint may constitute a statutory disqualification from registration under Section 8a(3)(M) of the Commodity Exchange Act. Respondents in this matter who apply for registration in any new capacity, including as an AP with a new sponsor, may be denied registration based on the pendency of this proceeding.

Pursuant to the provisions of CFTC Regulation 1.63, penalties imposed in connection with this Complaint may temporarily or permanently render Respondents who are individuals ineligible to serve on disciplinary committees, arbitration panels and governing boards of a self-regulatory organization, as that term is defined in CFTC Regulation 1.63.

**NATIONAL FUTURES ASSOCIATION**
**BUSINESS CONDUCT COMMITTEE**

Dated: 07/02/2015

By: _____
Chairperson

(/ecs/Complaints/2015:Complaint_Amp, Culp (6.15).docx)