IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT REES-EVANS, BRIAND PARENTEAU, JERMONE RAPHAEL SIV, <br><br> Plaintiffs, <br><br> v. <br><br> AMP GLOBAL CLEARING, LLC, AMP CLEARING, AMP FUTURES, AMP GLOBAL US, AMP GLOBAL USA, DANIEL LEE CULP, <br><br> Defendant. | 20 CV 7169 <br><br> Hon. Franklin U. Valderama |

RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs, ROBERT REES-EVANS, BRIAND PARENTEAU, JEROME RAPHAEL SIV, by and through their attorneys, R. TAMARA DE SILVA and JONATHAN LUBIN, hereby Respond to Defendants' Motion to Dismiss, stating:

**Introduction and Facts**

The Complaint in this matter alleges claims under 7 U.S.C. § 9, corresponding to 17 C.F.R. § 180.1. Complaint at 1. It also seeks damages under § 6b(e)3 of the Commodities Exchange Act, and Illinois common law. Plaintiffs are all clients of AMP. Complaint at 15-17. Daniel Lee Culp is the president of AMP Global Clearing. Complaint at 18. AMP Global Clearing LLC does business as AMP Clearing and several other names, but its function is to be a commodities broker and futures commission merchant (FCM) with the CFTC. Complaint at 19. AMP conducts futures business and provides futures execution services to its clients, including Plaintiffs. AMP at 19.

In 2020, Plaintiffs placed investments in futures and options on futures contracts in the May NYMEX Light Sweet May 2020 Crude Oil contracts and E-mini light Crude Oil futures (QM). Complaint at 26. A futures contract is an agreement to buy or sell a standardized asset on a specific

date. Today, futures contracts are frequently purchased through a futures exchange, as was the case here. Complaint at 27. An option on a futures contract gives the option holder the right, but not the obligation, to buy or sell a specific futures contract at some point in the future at a specified price. Complaint at 29. Futures contracts in raw commodities, like crude oil, are deliverable – meaning that at the expiration of the contract, the crude oil is physically delivered to the buyer of the contract. Complaint at 31.

On April 3, 202, the CME notified its customers (Defendants included) of "changed to Price and Strike Price Eligibility Flags for Certain Energy Options Contracts." The basic idea of this warning was that there was high market volatility in certain contracts, and specifically light oil contracts. Complaint at 34. On April 8, 2020, the CME sent out additional regulatory advisories about the possibility that oil contracts would go negative. It warned that it was testing plans to support the possibility of negative options contracts. Complaint at 35. On April 15, 2020, yet another advisory was sent to clearing firms and other market participants stating that the CME was prepared to "provide an environment where firms could test negative prices." Complaint at 36. Finally, in the morning of April 20, 2020, CME once again warned that oil prices could go negative. Nonetheless, AMO did not liquidate positions or take other remedial steps. It did nothing. Complaint at 37.

On April 20, 2020, Plaintiffs accounts held long positions on QM contracts. Complaint at 32. That means that Plaintiffs owned the contracts with the expectation that they would become more valuable. As predicted, QE contracts gradually declined during the day, dropping to -$37.62 by the end of trading. Complaint at 38.

Despite knowing of this possibility, AMP failed to test online platforms or otherwise correct system deficiencies. Nor did it at any time warn its customers that it would take no steps to test for or correct system deficiencies it had been warned to do. It also did not forward the multiple

warnings to its customers about the possibility of negative trading. Complaint at 42. During the day, AMP's trading platforms continued to show incorrect prices and account values, though the platform appeared to be functioning normally. Complaint at 43. Many traders were trapped in their positions; during this time, plaintiff's attempted to exit their positions multiple times. Complaint at 44. Plaintiffs were unable to place orders below zero in May 20 Crude Oil products, and were therefore unable to exit their positions. Complaint at 52.

The Complaint contains 6 Counts: 1.) violations of 7 U.S.C. § 9 and 17 C.F.R. § 180.1; 2.) violations of the Implied Covenant of Good Faith and Fair Dealing; 3.) violations of CEA Section 6b(e)3; 4.) negligence; 5.) gross negligence; and 6.) breach of contract.

The AMP contract states that the "customer agrees that AMP, at its discretion, may establish trading limits for Customer's Account and may limit the number of open positions… which Customer may execute, clear, and/or carry with or acquire through it." Defendant's Exhibit 1 ("Contract"), at 3. It also states that "AMP has no obligation or responsibility to update any market recommendations or information it communicates to Customer." Contract at 3. It gives AMP the right to liquidate customer positions. Contract at 5. It contains a "Risk Acknowledgment" that "customer acknowledges that trading in Contracts is speculative, involves a high degree of risk and is suitable only for persons who can assume risk of loss in excess of their margin deposits." Contract at 8. That section is lengthy and clear: trading is extremely risky. But it does not mention the possibility of trading in the negative. Finally, the contract refers to the "Risks Associated with System Failure," stating:

> Trading through an electronic trading or order routing system exposes you to risks associated with system or component failure. In the event of system or component failure, it is possible that, for a certain time period, you may not be able to enter new orders, execute existing orders, or modify or cancel orders that were previously entered. System or component failure may also result on loss of orders or order priority." Contract at 12.

The Motion refers to the notion that AMP "did not own, operate, maintain, or control electronic trading platforms." It made further representations that Plaintiffs "had to enter into a separate contract with the independent electronic trading platform companies in order to execute futures trades with AMP." No exhibits or affidavits were offered in support of this claim, which is contrary to the Complaint's allegations.

## Argument

Under Federal Rules of Civil Procedure § 12(b)(6), dismissal of a complaint is proper where it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim on which relief may be granted. Hickey v. O'Bannon, 287 F.3d 656, 657 (7 Cir., 2002). The standard for dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is where the Plaintiff has failed to state a claim upon which relief can be granted. However, all well-pleaded facts, and any reasonable inferences drawn therefrom, are accepted as true and are construed in favor of the plaintiff. *Id.*; Stachon v. United Consumers Club, 229 F.3d 673, 675 (7 Cir. 2000).

Federal Rules of Civil Procedure § 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint so pled, "must provide the defendant with fair notice of what the ... claim is and the grounds upon which it rests." Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citation omitted). Federal Rules of Civil Procedure § 9(b) adds that the element of fraud is subjected to a higher pleading standard, which will be discussed more completely below.

### I. Count I, seeking damages under 7 U.S.C. § 9, states a claim

To state a claim for securities fraud under 7 U.S.C. § 9, and the corresponding section in the C.F.R., "a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2)

4

scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Cornielsen v. Infinium Cap Mgmt., 916 F.3d 589, 598 (7 Cir. 2019). Because that statute authorizes damage for securities *fraud*, a the element of fraud is held to a heightened pleading standard under F.R.C.P. 9(b). *Id.* "This generally means "describing the `who, what, when, where, and how' of the fraud." *Id.*

      a. *The Complaint adequately alleges the underlying fraudulent conduct.*

However, as the Complaint alleges, and as the attached documents demonstrate, the Defendants advertised and promised "a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities ." Brokers do, after all, have a fiduciary duty to their clients. Scott v. The Dime Savings Bank of New York, 886 F.Supp. 1073, 1079 (S. D. N.Y., 1995). A broker, for example, "has a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it. Conway v. Icahn & Co., 15 F.3d 504, 510 (2 Dist. 1994)(finding that a broker has a fiduciary duty to warn a client of margin calls). The Motion points to the fine print in the contract which warns that investing is risky. But the abstract suggestion that the market is risky is not the same thing as simply forwarding the message, in a timely fashion, that these specific futures were likely to go negative. Futures risk statements are fabled for their length. But the one at issue here never mentioned is the possibility that futures prices could go negative. The April 20, 2020, April 15, 2020 and April 8, 2020 warnings were addressed to clearing firms and futures commission merchants, not to Plaintiffs, who were not sent these warnings. The Complaint includes a statement by the Chairman of the CME Group, Inc., in which he states that the exchange relies on the futures commissions merchants to communicate the advisories to its customers. Complaint ¶ 15.

The story with respect to the failure to liquidate is much the same. Defendants specifically advertised that they have robust risk management processes. Liquidating Plaintiffs positions, after simply warning Plaintiffs of their precarious position, was a simple one – not even a robust one. Yet Defendants did not do that. True, the contract which specifically allows Defendants to liquidate Plaintiffs' positions does not state explicitly that they must do so. But neither does the contract simply state *caveat emptor* and relieve Defendants of all responsibility.

Further, though part of the problem was the fact that Defendants did not warn Plaintiffs of the impending problems with the oil contracts, the Complaint also alleges that the platform did not permit trading once the contracts fell below zero. That is to say, the problem was not just that there was a duty to warn, but rather that there was a duty to facilitate the liquidation of contracts in precisely this circumstance.

On this score, Defendant's weakest argument is easily that its failure to provide an option to modify or offset its position in its electronic trading platform, and its failure to heed CME's warning that electronic trading could be impacted by negative prices on oil futures was disclaimed. The disclaimers refer to the possibility of computer error, not to the possibility that the platform was not designed to address negative trading. Not only did the Defendants fail to pass along or even heed the CME's warnings, they concealed the fact that they would take no steps to prepare their platforms and systems to clear trades when these warnings became reality.

The disclosures disclaim liability premised upon software glitches, not glaring and foreseeable failures. There is a difference, for example, between Zerman v. Jacobs, 510 F.Supp. 132, 134 (S.D. N.Y, 1981), in which plaintiffs seized upon an error in the computerized monthly statement that they characterized as "knowingly falsified" and the instant matter. *Id.* The Court, there, found that what likely an inadvertent computer error could not be fraud. *Id.* Similarly, in Alaska Elec. Pension Fund v. Adecco S.A., 434 F. Supp. 2d 815, 827 (S.D. Cal. 2006), the Court

found that what was being characterized as willful was likely an error in the company's computer system.

Here, by contrast, the CME specifically warned about this exact possibility, and Defendants did not need the warning. That failure was knowing, not inadvertent. Defendants knew that their software would not be able to handle negative transactions. The Defendants had an interest in not addressing the CME warnings -they avoided having to spend time and significant financial resources in making their systems able to handle negative prices-saving money on making the necessary repairs, rapidly, to the software so that it could allow trading in the negative. There was no computer failure here. Indeed, the platforms did what they were designed to do, and were unable to do what they were not designed to do[1].

The same is true of Defendants' citation to.

The Motion attaches an exhibit showing a single trade in the negative; but even if a denial of the facts of the Complaint were permitted at this stage, this single exhibit is not such a denial. If Plaintiffs were not permitted to exit their positions due to a poorly designed platform, that a single example of trading in the negative can be conjured is no denial of what occurred.

    b. *The Complaint adequately alleges scienter.*

On the question of Scienter, there is no dispute that the CME issued warnings that were not heeded, not forwarded, and were not addressed in any meaningful way, that oil contracts might go negative.

> Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so

---

[1] Fesseha v. TD Waterhouse Investor Servs., 747 N.Y.S.2d 676 (N.Y. Sip. Ct. 2002), cited by Defendants, does not seem to have anything to do with computer systems. But the language cited is identical to Zerman v. Jacobs, 510 F.Supp. 132, 134 (S.D. N.Y, 1981), which may have been the intended citation.

obvious that the actor must have been aware of it. Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977), cited in U.S. Commodities Futures Trading Comm'n v. Kraft, 153 F.Supp.3d 996, 1015 (N.D. Ill, 2015).

Sundstrand Corp. clarified that its understanding of *scienter* was recklessness that rose to the level of willfulness *Id.* That is, "the danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing, and the omission must derive from something more egregious than even "white heart/empty head" good faith." *Id.* Given the absence of other *indicia* of *scienter,* the lack of an alleged motive is particularly significant." McGee v. Am. Oriental Bioengineering, Inc., No. CV 12-5476 FMO (SHX), 2014 WL 12586107, at *15 (C.D. Cal. Sept. 23, 2014)(" the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."). Logically, when there is no such absence of *indicia* of *scienter* – as here – the lack of malice is not particularly significant.

## II. Count III, violation of 7 U.S.C. § 6b(e)3, states a claim

The Motion to Dismiss contains a very short request that this Court dismiss the Count for fraud under § 6b(e)(3). Under 7 U.S.C. § 6b(e)(3):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any registered entity, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery (or option on such a contract), or any swap, on a group or index of securities (or any interest therein or based on the value thereof) —
> ...
> (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Perhaps a fair question exists as to what this count adds to the previous count. The Motion to Dismiss does not ask that question. Instead, it claims that the threadbare allegations that are specific to that count do not state a claim for which relief can be granted. However, under federal pleading standards, the question is whether the Complaint, when taken as a whole, provide a theory of relief.

Even separating the Complaint into separate counts is "throwback." N.A.A.C.P., *supra*. The Motion does not identify the elements of the count, or which elements are not met. To the extent that the prior count already alleged commodities fraud, this one does as well. The Motion wonders what the factual basis is for this count, then suggests that perhaps it is based upon the same facts as Plaintiff's § 180.1 claims. This suggestion is correct.

### III.     The Economic Loss Doctrine does not apply to this matter

> The Economic Loss Doctrine, in a sentence, is the doctrine that "a plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort." In re Chicago Flood Litigation, 176 Ill.2d 179 (Ill. 1997). The exceptions to the doctrine very clearly do not apply here. But that is largely because the doctrine itself does not apply here. The evolution of the economic loss doctrine shows that the doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client. Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty. Congregation of the Passion v. Touche Ross, 159 Ill.2d 137, 639 N.E.2d 503, 514 (Ill., 1994).

In that matter, Court found that the Economic Loss Doctrine does not apply to accounting malpractice, like other forms of professional liability. *Id.*

The instant matter is more similar to accounting malpractice than to the Chicago Flood, in which the principal concern was the economic effects of physical danger. Here, Defendants had a duty to Plaintiff, at the very least, to ensure that the platform allowed trading in the negative – particularly given the multiple warnings to Defendants. But they also had a duty to forward CME and other communications regarding oil contracts.

### IV.     The Breach of Contract and Implied Covenant of Good Faith and Fair Dealing counts should be dismissed, as Defendants suggest

After examining the arguments contained in the Motion to Dismiss as to the Breach of Contract and Implied Warranty counts, it is clear that Defendants' arguments are meritorious.

9

Plaintiffs therefore do not defend these counts. Further, it is indeed true that there is no Count VI in the Complaint.

## Conclusion

The Motion to Dismiss is incorrect as to the lion's share of the Complaint. Defendants had every warning in the world that holding long positions in oil futures was dangerous and chose not only to not forward those warnings, but they also took no acts to ensure the functioning of its online platform. As a result, when Plaintiffs attempted to leave their positions, they were unable to. Plaintiffs were owed a duty by these Defendants that they failed to live up to. To the extent that Defendants suggest that there are factual defenses, they are perfect fodder for the process of discovery. Defendants should be required to Answer the Complaint.

WHEREFORE, Plaintiffs request that this Honorable Court DENY the Motion to Dismiss, other than as otherwise stated here, and require Defendants to ANSWER the Complaint.

Respectfully submitted,

/s/ R Tamara de Silva
R Tamara de Silva (lead counsel)
Law Offices of R Tamara de Silva, LLC
980 N Michigan Avenue, Suite 1400
Chicago, IL 60611
Tel: (312) 810-8100
Email: tamara@desilvalawoffices.com

/s/ Jonathan Lubin
Jonathan Lubin
8800 Bronx Ave., Suite 100H
Skokie, IL 60077
Tel: (773) 954-2608
Email: jonathan@lubinlegal.com